**FILED**
United States Court of Appeals
Tenth Circuit

**July 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JESSE W. NICHOLSON,

      Defendant-Appellant.

No. 11-2169

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:10-CR-03163-RB-1)**

---

Gregory J. Garvey, Assistant Federal Public Defender, Office of the Federal Public Defender for the District of New Mexico, Las Cruces, New Mexico, for Defendant-Appellant.

Jessica Cárdenas Jarvis, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, and John Grasty Crews, Assistant United States Attorney, on the brief), Office of the United States Attorney, District of New Mexico, Las Cruces, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **McKAY** and **GORSUCH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

    Defendant Jesse W. Nicholson appeals the district court's denial of his

motion to suppress evidence.  He appeals after entering a conditional guilty plea

to three drug and weapons-related charges. We reverse the district court's ruling on the motion to suppress and remand with directions to vacate Nicholson's convictions.

**I**

Midday June 17, 2010, defendant Jesse Nicholson stopped at a red light at the busy intersection of 19th Street and Main Street in Roswell, New Mexico. Nicholson was in a left-turn lane, planning to turn from eastbound 19th Street and enter northbound Main Street. Roswell Police Department Officer Doyle Baker was in his vehicle behind Nicholson. Main Street has multiple lanes in each direction.

When the traffic light changed to permit a left turn, Nicholson made a left turn into Main Street's outermost (i.e. right, northbound) lane. He did so, he says, to reach a business near the intersection. He proceeded in this fashion so he would not impede traffic when he made a quick shift into the right lane to enter the parking lot. The intersection had no markings or instructions to indicate that a driver must maintain and complete a turn by remaining in the left lane.

But according to Officer Baker, Nicholson was insufficiently cautious in making his left turn. Baker testified that by Nicholson's completing his turn in the right lane he cut off cars making right-hand turns on a red light from

westbound 19th Street onto Main Street's outermost, northbound lane.[1]  Baker

stopped Nicholson, believing Nicholson's failure to enter the left lane when

completing his left turn violated Roswell ordinance 12-6-5.1.  Smelling marijuana

as he approached the vehicle, Baker asked Nicholson to step out of the car.  As

Nicholson complied with this request, Baker spotted two glass pipes—commonly

used for smoking methamphetamine—and a police scanner in the driver's door

pocket.  Baker asked for consent to search the vehicle; Nicholson refused.

Officer Baker released Nicholson after issuing a traffic citation, but seized the

car.

Police towed the car and also sought a search warrant.  After receiving and

executing the search warrant, they discovered "various items, including over fifty

grams of methamphetamine hidden underneath the dashboard, a loaded .40 caliber

pistol, a scale, assorted pills, marijuana seeds, small plastic baggies, and a small

notebook with items written down in it."  ROA Vol. I at 20-21.

*Procedural Background*

A grand jury subsequently returned a three-count indictment against

Nicholson based on the items found in the car.  Count 1 of the indictment charged

Nicholson with unlawfully, knowingly and intentionally possessing with intent to

distribute 50 grams and more of a mixture and substance containing a detectable

---

[1]  We note, however, that under N.M. Stat. Ann. § 66-7-105(C), any cars making a right turn on red needed to "yield the right-of-way to all pedestrians and vehicles lawfully or approaching the intersection."

amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2. Count 2 of the indictment charged Nicholson, a convicted felon, with knowingly possessing a firearm in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). Count 3 of the indictment charged Nicholson with knowingly carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Nicholson filed a motion to suppress the evidence obtained from the traffic stop. Nicholson argued that N.M. Stat. Ann. § 66-7-322—which is essentially analogous to the city ordinance he was cited as violating—did not prohibit the left turn he made, and that, as a result, the traffic stop violated his Fourth Amendment rights. At the hearing held on the motion to suppress, Nicholson suggested that the court should certify the question to the New Mexico Supreme Court if it was uncertain about the interpretation of the ordinance. The district court denied this request, instead stating "I just have to do the best I can." ROA Vol. III at 417. The court then determined the traffic stop was legal because the ordinance prohibited the left turn made by Nicholson. The court then denied Nicholson's motion to suppress.

The case proceeded to trial in March 2011, but a jury was unable to reach a verdict on any count. Nicholson subsequently entered into a conditional plea agreement, pleading guilty to all counts, but reserving his right to appeal the denial of his motion to suppress. ROA Vol. I at 29-35. Nicholson was sentenced

to 63 months in custody on counts 1 and 2, to be served concurrently, and 60 months' custody on count 3, to be served consecutively to the sentences on counts 1 and 2.

## II

*a. Standard of Review*

When reviewing a denial of a motion to suppress, we review de novo the district court's conclusion that the officer's actions were reasonable. United States v. Burciaga, 687 F.3d 1229, 1230 (10th Cir. 2012). Considering the evidence in the light most favorable to the prevailing party, we defer to the district court's findings on questions of fact, reviewing only for clear error. Id. We review questions of law de novo. United States v. Johnson, 584 F.3d 995, 998 (10th Cir. 2009).

*b. Officer Violated the Fourth Amendment by Stopping Nicholson on the Basis of     a Turn That was Not Illegal*

The Fourth Amendment requires that a traffic stop be "objectively justified" at its inception. United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir. 2004). That means a traffic stop must be "based on an observed traffic violation" or a police officer's "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Eckhart, 569 F.3d 1263, 1271 (10th Cir. 2009) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). Although an officer's mistake of fact

can still justify a probable cause or reasonable suspicion determination for a traffic stop, an officer's mistake of law cannot. United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005). "[F]ailure to understand the law by the very person charged with enforcing it is *not* objectively reasonable." Id.

Nicholson argues Officer Baker made a mistake of law when he stopped Nicholson for making a left turn into Main Street's outermost lane. The district court rejected this argument, concluding Roswell traffic ordinance § 12-6-5.1 prohibited this conduct. We review the district court's construction of state law de novo. DeGasso, 369 F.3d at 1144. The New Mexico Supreme Court has not interpreted this provision, so we must instead determine how the New Mexico Supreme Court would interpret it were the court to face the issue. Tibbetts, 396 F.3d at 1137-38.

Nicholson was stopped and cited for a violation of Roswell traffic ordinance § 12-6-5.1, which regulates the position and method of turns. More specifically, the officer stopped Nicholson on the assumption that § 12-6-5.1 requires a driver making a left turn to complete the turn in the leftmost lane. Id.[2]

---

[2] Although most states require a driver to turn left into the leftmost lane, others permit drivers to turn left into any lane. See, e.g., Cal. Veh. Code § 22100(b) ("After entering the intersection, the left turn shall be made so as to leave the intersection in *a* lane lawfully available to traffic moving in that direction upon the roadway being entered . . . .") (emphasis added); Fla. Stat. Ann. § 316.151(b); Tex. Transp. Code Ann. § 545.101(b)(2). But see, e.g., Colo. Rev. Stat. Ann. § 42-4-901(b) ("Whenever practicable, the left turn shall be made to the left of the center of the intersection so as to leave the intersection or other

(continued...)

Roswell has adopted the New Mexico Uniform Traffic Code, which includes

ordinance § 12-6-5.1, set out below:

> 12-6-5.1 REQUIRED POSITION AND METHOD OF TURNING AT INTERSECTION.
> The driver of a vehicle intending to turn at an intersection shall do so as follows:
>
> A. Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the street.
>
> B. At any intersection where traffic is permitted to move in both directions on each street entering the intersection, an approach for a left turn, except where left-turn provisions are made, shall be made in that portion of the right half of the street nearest the center line thereof and by passing to the right of such center line where it enters the intersection and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the street being entered. Whenever practicable the left turn shall be made in that portion of the intersection to the left of the center of the intersection.
>
> C. Upon a street with two (2) or more lanes for through traffic in each direction, where a center lane has been provided by distinctive pavement markings for the use of vehicles turning left from both directions, no vehicle shall turn left from any other lane. A vehicle shall not be driven in this center lane for the purpose of overtaking or passing another vehicle proceeding in the same direction. Any maneuver other than a left turn from this center lane will be deemed a violation of this section.

---

[2](...continued)
location in the extreme left-hand lane lawfully available to traffic moving in the same direction as such vehicle on the roadway being entered."); Utah Code Ann. § 41-6a-801(2)(b) ("Left turns . . . whenever practicable, shall be made by turning onto the roadway being entered in the extreme left-hand lane for traffic moving in the new direction . . . ."); Wis. Stat. Ann. § 346.31(3)(c) ("A left turn shall be completed so as to enter the intersecting highway in the lane farthest to the left which is lawfully available to traffic moving the direction of the vehicle completing the left turn.").

D. At any intersection where traffic is restricted to one (1) direction on one (1) or more of the streets, the driver of a vehicle intending to turn left at any such intersection shall approach the intersection in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of such vehicle and after entering the intersection the left turn shall be made so as to leave the intersection, as nearly as practicable, in the left-hand lane lawfully available to traffic moving in such direction upon the street being entered.

E. No person shall drive across any private or public property, including but not limited to parking areas, driveways and service station areas, for the purpose of avoiding any traffic control device or sign.

Although the New Mexico Supreme Court has not interpreted this provision, the New Mexico Court of Appeals recently concluded the analogous state statute,[3] N.M. Stat. Ann. § 66-7-322, did not prohibit the type of left turn made by Nicholson. State v. Almeida, 253 P.3d 941, 943-44 (N.M. Ct. App. 2011). It noted that Section 66-7-322(B) does not by its text require that a driver turn into a specific lane, while other sections which address turns do. Section 66-7-332(A) requires a driver to enter the rightmost lane when making a right turn. Section 66-7-332(D) requires a driver to enter the leftmost lane when making a left turn onto or from a one-way street. Id. Reading the statute as a whole, the court persuasively reasoned the omission of a restriction in Section 66-7-322 (B) combined with the detailed requirements in (A) and (D)

---

[3] The only differences between the Uniform Traffic Ordinance and the state statute (A)-(D) are that the Uniform Traffic Ordinance: 1) uses "street(s)" instead of "roadway(s)"; and 2) includes numerals next to numbers written as words.

demonstrated the absence of a legislative intent to prohibit left turns into the outermost lane when travel on one-way streets is not at issue. Id. at 944.

Although the government correctly asserts we need not adopt the opinion of the intermediate appellate court, see United States v. Valadez-Valadez, 525 F.3d 987, 993 (10th Cir. 2008), it has advanced no rationale which would justify our departing from its reasoning. The court of appeals applied sound methods of statutory interpretation, reading the statute as a whole so that it gave effect to all of its provisions. Any contrary reading would contravene the legislature's apparent intent, requiring us to read words into the statute which the legislature demonstrated it could have, but did not, include. Despite the many statutory provisions which regulate turns, none specifically prohibits the method Nicholson employed in making his turn.[4] We conclude the traffic ordinance relied upon by

---

[4] Although it never explicitly explained its reading of the ordinance in its brief, the government at oral argument suggested that the second sentence of § 12-6-5.1(B) prohibits turns like those made by Nicholson. But, by its text, this sentence only regulates the driver's position while *within* the intersection—presumably to avoid impeding oncoming traffic making left turns in the opposite direction—and does not address the proper positioning of the vehicle once the driver leaves the intersection. Again, we will not read into the ordinance words that could have been included. Statutes in other states with similar language regulating left turns specify which lane a driver must turn into. See, e.g., Colo. Rev. Stat. Ann. § 42-4-901(b) ("Whenever practicable, the left turn shall be made to the left of the center of the intersection so as to leave the intersection or other location in the extreme left-hand lane lawfully available to traffic moving in the same direction as such vehicle on the roadway being entered."); Neb. Rev. Stat. Ann. § 60-6,159(2) ("[T]he left turn shall be made so as to leave the intersection, as nearly as practicable, in the extreme left-hand lane lawfully available to traffic moving in such direction upon the roadway being

(continued...)

Officer Baker did not provide a legal basis for his stop of Nicholson.

The government insists we should nonetheless uphold the stop because the law which served as the basis for Officer Baker's stop is not "plain and unambiguous." Even assuming the law was unclear, we cannot agree. In our circuit, as in most others, mistakes of law made by an officer are objectively unreasonable. See Tibbets, 396 F.3d at 1138; see also United States v. McDonald, 453 F.3d 958, 960-62 (7th Cir. 2006) (officer lacked probable cause to stop defendant based on mistaken belief defendant violated law by using his left-turn signal while going around a bend); United States v. Chanthasouxat, 342 F.3d 1271, 1278-80 (11th Cir. 2003) (held a mistake of law invalidated a traffic stop even though the officer believed the law existed based on training, guidance from a magistrate, and the more than 100 tickets he had written citing it); United States v. Lopez-Soto, 205 F.3d 1101, 1106-07 (9th Cir. 2000) (officer lacked reasonable suspicion to stop defendant based on mistaken belief about proper placement of registration sticker); United States v. Miller, 146 F.3d 274, 277-79 (5th Cir. 1998) (officer lacked probable cause to stop defendant based on mistaken belief defendant violated law by using turn signal without changing

---

[4](...continued)
entered. Whenever practicable, the left turn shall be made in that portion of the intersection to the left of the center of the intersection."); N.H. Rev. Stat. Ann. § 265:42(II)(a) ("Whenever practicable, a left turn shall be made to the left of the center of the intersection and so as to leave the intersection or other location in the extreme left hand lane lawfully available to traffic moving in the same direction as such vehicle on the roadway being entered.").

lanes or turning); but see United States v. Washington, 455 F.3d 824, 827 (8th

Cir. 2006) (instead looking at whether a mistake of law is "objectively

reasonable").[5]

As we said in Tibbetts,"failure to understand the law by the very person

charged with enforcing it is *not* objectively reasonable."  396 F.3d 1132 at 1136.

See also  Sherouse v. Ratchner, 573 F.3d 1055, 1059 (10th Cir. 2009) ("While an

officer's reasonable but mistaken understanding of the *facts* justifying a search or

seizure does not negate the legitimacy of a probable cause determination, an

officer's reasonable but mistaken understanding of the applicable law he is

enforcing does.").  Nothing in our opinion in Tibbetts suggests we actually meant

to limit this rule only to the mistaken understanding of "plain and unambiguous

laws."[6]  In providing the district court with guidance for interpreting the Utah

---

[5] We acknowledge, however, that there is considerably more tension between state appellate courts as to whether police officer's "reasonable" mistakes of law should be excused.  Compare State v. Louwrens, 792 N.W.2d 649, 650 (Iowa 2010) ("[E]vidence derived from a stop based on a law enforcement officer's mistake of law must be suppressed.") and State v. Anderson, 683 N.W.2d 818, 823-24 (Minn. 2004) with Moore v. State, 986 So.2d 928, 935 (Miss. 2008) (en banc) ("Officer Moulds had sufficient probable cause to pull [defendant] over, although, as it turns out, Officer Moulds based his belief of a traffic violation on a mistake of law.") and State v. Heien, 737 S.E.2d 351 (N.C. 2012).  See also Dissent Op. at 19-20.

[6] Although we used the "plain and unambiguous" language in United States v. DeGasso, 369 F.3d 1139, 1144-45 (10th Cir. 2004), there is no indication we actually intended to distinguish cases in which the officer makes a mistake about a "plain and unambiguous law" from cases involving more murky ones.  Instead, we were merely describing what actually happened in that case: the officer

(continued...)

statute at issue we said that "Utah courts look to the plain language of the statute, and only when the language is ambiguous do they seek guidance from legislative history or policy considerations." Id. at 1138. This instruction on ambiguity seems unnecessary if we only fault police officers when a law is plain and unambiguous.

Despite the dissent's contention, we come to this conclusion by more than just isolating a single sentence of the Tibbetts opinion. Throughout the opinion in Tibbetts, we also took care to distinguish the difference between mistakes of fact and mistakes of law—something that only matters if we treat them differently. Cf. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005) ("In any case, in our circuit the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry."). That is, we excuse reasonable mistakes of fact, but not "reasonable" mistakes of law. Remand to determine the question of whether the officer had made a mistake of fact or a mistake of law would have been unnecessary in Tibbetts if we applied a reasonableness analysis to both types of mistakes.

Moreover, we said that on remand "the district court must determine whether [Sergeant] Chugg had a reasonable articulable suspicion of a violation of

[6](...continued)
stopped the defendant for driving with fog lamps on during the day when Oklahoma law clearly only prohibited the use of fog lamps as a substitute for headlamps at night. Id. at 1144.

-12-

Utah's 'mudflap' law in light of the facts as Chugg observed them, or whether Chugg *simply misunderstood the law*." 396 F.3d at 1137 (emphasis added). Later we said "[w]e have consistently held that an officer's mistake of fact, *as distinguished from a mistake of law*, may support probable cause or reasonable suspicion." Id. at 1138 (emphasis added). Finally, we instructed the district court on remand to "determine whether Chugg's belief that the law was violated because the mudflaps did not fully cover the wheels was correct, a reasonable mistake of fact, or an impermissible mistake of law." Id. at 1139. Notably, we did not give the district court the option of deciding whether the officer made a "permissible" mistake of law.

Further, as we have acknowledged, requiring law enforcement personnel to know the law they are asked to enforce comports with a basic policy of fairness. If "[a]s a rule, . . . a defendant is presumed to know the law, we must expect as much from law enforcement." United States v. Orduna-Martinez, 561 F.3d 1134, 1137 n.2 (10th Cir. 2009). Permitting officers to excuse their mistakes of substantive law as "reasonable" "would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000). In addition, although the dissent repeatedly refers to our decision as creating a "new" rule of constitutional law, the outcome we propose here places us in accord with the vast majority of our sister circuits—whose decisions we have repeatedly

-13-

cited to in our earlier opinions.  See Orduna-Martinez, 561 F.3d at 1137 n.2

("Other circuits have held that a trooper's reasonable mistake of law cannot make

an otherwise impermissible stop reasonable.  In agreement with these circuits, we

have held that failure to understand the law by the very person charged with

enforcing it is *not* objectively reasonable.") (citations and quotations omitted);

see, e.g., Tibbetts, 396 F.3d at 1138 (citing United States v. Miller, 146 F.3d 274

(5th Cir. 1998)); DeGasso, 369 F.3d at 1144-45 (citing United States v.

Chanthasouxat, 342 F.3d 1271 (11th Cir. 2003)).  Given this precedent, we hold

the Officer Baker's actions were unreasonable whether or not the ordinance was

"plain and unambiguous."

Although we are bound by circuit precedent, we must also point out that

any fears that this rule is too restrictive are overstated.  Because we retain an

objective, totality of the circumstances analysis, actions taken based on a

subjective misunderstanding of the law will still, in some circumstances, be

considered reasonable.[7]  We would not, for instance, hold unreasonable the

actions of an officer who pulled over a motorist driving 75 miles per hour in a 55-

mile-per-hour zone, even if the officer himself believed the speed limit was 65

miles per hours.  Cf. United States v. Wallace, 213 F.3d 1216, 1220 (9th Cir.

2000) (initial stop justified where the officer's "observations correctly caused him

---

[7]  As the Fifth Circuit has pointed out, it is precisely because of the leeway we normally grant police officers that "the legal justification must be objectively grounded."  Miller, 146 F.3d at 279 (5th Cir. 1998).

-14-

to believe that Wallace's window tinting was illegal" although he was "wrong about exactly why").  Indeed, we will uphold a traffic stop as long as there was reasonable suspicion to stop the defendant for "'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (quoting Delaware v. Prouse, 440 U.S. 648, 661 (1979)).    See also Eckhart, 569 F.3d at 1271 (10th Cir. 2009) (upholding traffic stop despite officer's mistake of law because officer had reasonable suspicion to stop vehicle for another related violation of Utah law); United States v. Eckhart, No. 2:05CR529DAK, 2006 WL 1073465, at *3 (D. Utah Apr. 10, 2006) (state trooper testifying incorrectly about requirements of Utah law).  So although a defendant need only violate one provision of a vast number of local, state, and federal laws to trigger criminal liability, police officers can argue they had reasonable suspicion to stop a defendant based on *any* of those laws—even if the officer was mistaken about the specific law he thought the defendant was violating.  A single mistake by a law enforcement officer will not necessarily invalidate the stop and any resulting search.

Law enforcement officials have another advantage over citizens—they can, in some circumstances, seek a warrant to confirm their belief about the interpretation of a statute.  True, as the dissent points out, "obscure regulatory edicts" may exist.  See Dissent Op. at 16.  But we also cannot imagine many circumstances where a law enforcement official would need to execute a

-15-

*warrantless* search based on someone violating one of those regulations. Even if we held the subsequent search unreasonable because the judge also misinterpreted the law, our good faith precedent would likely provide an exception to the exclusionary rule. Moreover, one would hope that a law enforcement official would clarify his understanding of any unclear provision before bringing the full force of the law upon an unsuspecting citizen.

While we acknowledge that the Supreme Court has excused other mistakes made by police officers, none of its rationales for excusing those mistakes apply to mistakes of substantive law. The Supreme Court has excused an officer's mistake regarding the constitutionality of a law because the police must usually assume the legislature will only pass laws that are constitutional. See Michigan v. DeFillippo, 443 U.S. 31, 38 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."). Police officers have a duty "to enforce laws until and unless they are declared unconstitutional." Id. "If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." Illinois v. Krull, 480 U.S. 340, 350 (1987). Indeed, "[s]ociety would be ill-served if its police officers took it

-16-

upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." DeFillippo, 443 U.S. at 38. The same reliance argument does not apply to mistakes about substantive law.

Additionally, we permit reasonable mistakes of fact because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." Hill v. California, 401 U.S. 797, 804 (1971). But the Supreme Court has also specifically noted that this reasonableness analysis applies to "*factual* judgments that law enforcement officials are expected to make." Illinois v. Rodriguez, 497 U.S. 177, 184 (1990) (emphasis added). A totality of the circumstances approach makes sense in this factfinding role, because officers can exercise their judgment based on their experience and common sense. United States v. Cortez, 449 U.S. 411, 418 (1981) ("[T]he evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."). "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." Brinegar v. United States, 338 U.S. 160, 176 (1949). Officers with reasonable suspicion often have no way to confirm a violation has been committed without further investigation. Cf. United States v. Cashman, 216 F.3d 582, 587 (7th Cir. 2000) ("A trooper in Spetz's position, then, passing or approaching [defendant]'s vehicle on the roadway, could readily and reasonably think that the crack [in the

-17-

windshield] met the administrative criteria for excessive cracking . . . [even though] careful measurement after the fact might reveal that the crack stopped just shy of the threshold for 'excessive' cracking or damage[.]").  But this need to make probabilistic judgments about the relevance of facts does not transfer to the interpretations of laws, of which officers can learn a definitive meaning before acting.

Finally, reformulating the legal question at issue in this case will likely clear up many of the dissent's remaining uncertainties.  The term "mistake of law" is somewhat misleading, as it is ultimately irrelevant what law the officer thought the defendant was violating.  See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").  The relevant question, in a case such as this one, is:  Against what interpretation of the law should we assess the facts when deciding whether there was reasonable suspicion or probable cause to make a traffic stop?  Like most of our sister circuits, we judge the facts against the correct interpretation of the law, as opposed to any other interpretation, even if arguably a reasonable one.[8]

This reformulation likely clarifies the result in many of the borderline cases

_____

[8]  That is, jurisdictions that permit "reasonable" mistakes of substantive law require courts to assess whether there are also any incorrect (but reasonable) interpretations of our laws that might justify the government's assertion that an officer had observed sufficient facts to establish reasonable suspicion or probable cause.

cited by the dissent.[9] In the case of a local ordinance that conflicted with state law, an officer would likely be reasonably justified in relying on the local ordinance based on the reliance principles set forth in the Supreme Court's cases analyzing mistakes regarding the constitutionality of the law. And some mistakes of law—say as to legal ownership—might nonetheless be excused as being closer to a mistake of fact, as they are not the substantive law upon which the officer is basing his reasonable suspicion or probable cause determination. Finally, we reiterate that we will uphold traffic stops as long as the law enforcement officer cites particularized facts that show he could have had a reasonable suspicion that *any* law was being violated.

## III

The government argues that we should nonetheless affirm the district court because either (a) another legal basis existed for Officer Baker stopping or citing Nicholson, or (b) the good faith exception first recognized in United States v. Leon, 468 U.S. 897 (1984), should be applied in this case. The litigation history of this case, however, precludes us from doing so.

In its written response to Nicholson's motion to suppress, the government argued that "Officer Baker had reasonable suspicion to conduct a traffic stop,"

---

[9] While the dissent characterizes these as "exceptions" to our rule, this again appears to be premised on the fact courts have misleadingly titled this as a rule about "mistakes of law." All the prevailing rule purports to do is require courts make probable cause determinations by assessing the facts against the correct interpretation of the law.

ROA Vol. I at 15, because he "observed [Nicholson's vehicle] fail to maintain the inside left lane as it was turning and cut in front of traffic," id. at 12. No other violation was mentioned, and the good faith exception under Leon was not asserted in the alternative. At the subsequent hearing on Nicholson's motion, Baker testified on direct examination, in consistent fashion with the government's arguments in its written response, that he observed Nicholson's vehicle "fail[] to maintain the inside left lane turning to the right-hand lane, cutting off traffic" in that lane. ROA Vol. III at 361. Later on in his direct examination, Baker testified that the basis for his stop of Nicholson, as well as the ensuing citation he issued to Nicholson, was "fail[ure] to maintain inside left lane while turning," which Baker described as a violation of both "State [and] City ordinance[s]." Id. at 370. During defense counsel's cross-examination of Baker, the district court asked Baker to clarify his previous testimony:

> THE COURT: Let me clarify something: How many violations are there here on this page that you saw?
> THE WITNESS: How many violations?
> THE COURT: Yes. I mean, are there one or two or more or just none, whatever. You ticketed him for one violation?
> THE WITNESS: Yes, sir.
> THE COURT: Is that all the violations that you saw?
> THE WITNESS: Yes, sir.
> THE COURT: All right. Now, as I look at this picture [of the intersection], is the violation occurring on Main Street on the northbound lane? No. Main Street is going north right?
> THE WITNESS: Yes, sir.
> THE COURT: Is the violation occurring on Main Street when he doesn't come behind the white car or is the violation occurring on 19th as he moves, perhaps, into the outside lane of 19th?

THE WITNESS: It's where he fails to maintain the left lane.

* * *

THE COURT: Okay. So it's not a matter of him bulging out into the right-hand lane as he was on 19th?

THE WITNESS: No, sir.

THE COURT: It's a matter of him swinging out into the outside lane on Main Street as he goes north?

THE WITNESS: Yes, sir. It he would have came into the interseciton wide and still maintained the left-hand lane, he would have been fine. It's the failing to maintain the left lane, crossing into the right lane, is the violation.

Id. at 379-80. And during recross-examination, Officer Baker quoted the provision of the ordinance he cited Nicholson with violating and then testified, "To me, that's saying that you need – the left turn shall be made to the left of the intersection maintaining the left lane. He [Nicholson] failed to do that." Id. at 390.

As discussed above, we will uphold a traffic stop as lawful on the basis of any traffic violation for which the facts known to the officer established reasonable suspicion, even when the officer did not cite that provision of the traffic code when making the traffic stop. But at no point during the hearing did the government argue the existence of any other traffic violation that would have supported Baker's stop of Nicholson. And although the government now argues for the first time on appeal that Officer Baker could have cited Nicholson for careless driving, there is no factual basis in the record for such a determination, even if we were inclined to overlook the government's failure to assert this argument below.

-21-

As for the good faith exception, the government made no mention of it during the district court proceedings and raises it for the first time in its appellate response brief. Typically, "[i]ssues and arguments which are not raised below will not ordinarily be considered on appeal." Mann v. United States, 204 F.3d 1012, 1017 (10th Cir. 2000). To be sure, "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994). But the government's failure to raise this issue in district court means the parties developed no record evidence on this point. Therefore, even were we to reject Nicholson's argument that the good faith exception does not apply as a matter of law, there is no support in the record for affirming the district court on the government's theory. See Dissent Op. at 21. ("Trying to administer the cost-benefit analysis [of the exclusionary rule] without the benefit of the district court's factual findings on the relevant questions makes a tough task tougher still.").

Nor is there, as the dissent urges, any basis for remanding the case for further factual findings on this issue. We have often instructed district courts to vacate convictions upon our reversing the denial of a motion to suppress. See, e.g., United States v. Neff, 681 F.3d 1134, 1143 (10th Cir. 2012); United States v. Benard, 680 F.3d 1206, 1215 (10th Cir. 2012); United States v. Trestyn, 646 F.3d 732, 744 (10th Cir. 2011). We see no reason the government should receive the

benefit of relitigating this motion as a result of its own failure to raise an issue in district court.

## IV

We REVERSE the district court's denial of the motion to suppress and REMAND with directions to vacate Nicholson's convictions.

11-2169, *United States v. Nicholson*

**GORSUCH**, **J.**, Circuit Judge, dissenting.

What should the court do when an officer detains an individual based on what later turns out to be a mistaken — but reasonable — belief that the law's been broken? My colleagues suggest that an investigative detention resting on an officer's mistake of law *always* violates the Fourth Amendment — even when the law at issue is deeply ambiguous and the officer's interpretation entirely reasonable. Having found a Fourth Amendment violation, they proceed to order the suppression of all evidence found during the detention and direct the dismissal of all charges. Respectfully, I have my doubts.

I

Jesse Nicholson was in a hurry. Instead of finishing his left turn onto Main Street in the inside lane near the median, Mr. Nicholson steered into the outside lane near the curb. Aiming to do a little shopping on that side of the street, Mr. Nicholson no doubt sought to save himself the trouble of a lane change and make his way to the store the faster for it.

Spotting Mr. Nicholson's maneuver, Officer Doyle Baker was none too pleased. He thought it violated the traffic code. As he understood the law, New Mexico drivers have to complete left turns in the inside lane of any road they enter that happens to bear multiple lanes. Mr. Nicholson didn't do that, and what's worse, by entering the outside lane instead he may have "cut off" another car trying to turn right. Here's how Officer Baker later depicted the scene:



After stopping Mr. Nicholson's car and while approaching the driver's window to issue a ticket, Officer Baker encountered a waft of burning marijuana spilling from the vehicle. A warrant application soon followed and then a search of Mr. Nicholson's car, a search that yielded not just marijuana but methamphetamine, an unlawful handgun, various pills — and now this litigation.

Before the district court, Mr. Nicholson's motion to suppress got him nowhere. He argued that evidence about the drugs and gun in his car should be excluded from any criminal proceedings against him because his traffic stop was unlawful. The government replied that the state traffic code required him to enter the inside lane after finishing his left turn, just as Officer Baker thought. With this the district court agreed, holding that "Officer Baker properly interpreted the [traffic code]. . . . [and] the stop was valid."

Only then did this seemingly simple case take a more complicated turn. As Mr. Nicholson prepared to appeal the district court's ruling, a divided panel of New Mexico's intermediate appellate court ruled in a separate case that the traffic code *doesn't* require left turners to enter the inside lane. *See State v. Almeida*, 253 P.3d 941, 944 (N.M. Ct. App. 2011). Though we aren't bound to accept that interpretation, though it came over a dissent, though the court today assumes New Mexico's left turn law is ambiguous, *see* Maj. Op. at 9, though many other states *do* have laws against the maneuver, *see id.* at 8 n.4, I agree with my colleagues that *Almeida* still has the better reading of the New Mexico traffic code, at least as it's currently constructed. So with the benefit of more than a little hindsight, we all agree Officer Baker, like the very able district court, made a mistake in reading the traffic code.

The question we face is what to do about it.

II

A

Instead of setting forth exact limits of the government's search and seizure powers in some numbingly detailed (and no doubt quickly antiquated) list of do's and don'ts, the framers of the Fourth Amendment more simply and ingeniously forbade all "unreasonable searches and seizures." U.S. Const. amend IV. In asking what triggers this test, in asking whether the government has acted *reasonably*, we must usually examine with care "the totality of the circumstances" or "the whole picture" of the case before us. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Rarely do we expect the Fourth Amendment's reasonableness standard to yield "readily, or even usefully, . . . a neat set of legal rules," *Sokolow*, 490 U.S. at 7, or "bright-line tests [or] mechanistic inquiries," *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013). Instead, by the very way it is written the Fourth Amendment more often requires us to assess the government's actions in each case as it comes to us against "commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). By its terms, the Fourth Amendment seems to favor a case-by-case approach, one sensitive to the totality of the circumstances found in the case at hand, one that takes a realistic

view of human capacities and limitations. *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

I don't doubt that many searches and seizures initiated because of an officer's mistake about the law — because of a mistaken belief that a law proscribes the defendant's conduct when none does — should be held unreasonable and so unconstitutional. Especially when the circumstances tend to suggest that the law is unambiguous, the error plain, the officer's actions inconsistent with his training or common sense. At the same time, it seems to me we just don't know enough yet about the totality of the circumstances surrounding Officer Baker's mistake in this case to assess its reasonableness (or lack of reasonableness) with any degree of confidence. We don't because the district court rested its decision on the (in hindsight, itself mistaken) view that Officer Baker read the traffic code correctly and thus simply had no reason to reach the question.

To be sure, we do know some important things about Officer Baker's conduct. With the benefit of *Almeida*, we know Officer Baker erred in his reading of the traffic code. But we also know that Officer Baker acted before *Almeida* issued; that no New Mexico authority rejected his interpretation of the traffic code at the time of the stop; that many other states hold unlawful turns like Mr. Nicholson's; and that the mistake the officer made about the meaning of New Mexico's traffic code was one the very able district judge and a dissent in

*Almeida* made as well. We know, as well, that we live in a world where some laws are ambiguous and don't admit an easy or even a single right answer, where interpretations of legal texts can be reasonable even though they may not be the ones we would choose. We recognize this reality in a whole array of contexts. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (qualified immunity); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (habeas); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 & n.11 (1984) (administrative law). And we know that the majority today proceeds on the assumption that the left turn law at issue before us *is* indeed an ambiguous one. Maj. Op. at 9.

But beyond these few things, we know little. We don't know, for example, whether law enforcement officers in New Mexico typically share Officer Baker's understanding that left turns into right lanes are illegal, whether Officer Baker relied on police training in thinking as much, or even whether as a practical and commonsensical matter a good many New Mexicans share Officer Baker's skepticism about the legality of left turns into outside lanes. And this isn't to say additional fact-finding could only help the government's case. We also know nothing about the quality of any training Officer Baker received or the reasonableness of any decision Officer Baker made to rely on it. Or whether, perhaps, he just assumed that Mr. Nicholson's maneuver had to be illegal.

At this stage, then, it seems to me we can only guess about the totality of the circumstances, the "factual and practical considerations of everyday life,"

relevant to this case; and only guess, too, about how those considerations might inform a decision on the dispositive question whether a "reasonable and prudent" officer would have acted as Officer Baker did in the circumstances he faced. *Ornelas*, 517 U.S. at 695. Rather than guess, I would allow the district court, with its fact-finding powers, the chance to take up those questions in the first instance. In this appeal, I would simply correct the district court's mistake about New Mexico's traffic law and remand the case to the district court for its reconsideration in that new light. Any decision this court might eventually be called on to make after remand would in this way be better informed by the relevant facts the district court alone can develop — and it would in this way benefit, too, from the district court's considered judgment based on a correct understanding of the traffic code.

B

Instead of resting at this modest destination, my colleagues press on to a more ambitious one. Rather than correct the district court's legal error and remand for further investigation into the reasonableness or unreasonableness of Officer Baker's mistake in that new light, they proceed to hold categorically that an officer mistake of substantive law *always* violates the Fourth Amendment. They say "reformulating the legal question at issue in this case will likely clear up" any confusion why this new rule of constitutional law is necessary. Maj. Op. at 16. But their reformulation only makes plain their view that it's "irrelevant"

whether the officer's interpretation of the law was or was not "arguably a . . . *reasonable* one." *Id.* at 17 (emphasis added). In the court's view, an officer's stop or search resting on a mistaken interpretation of substantive law *always* violates the Fourth Amendment — even if the law is confoundingly opaque and the mistake one entirely reasonable people would make. *Id.* at 10.

Not only do I find it unnecessary to go so far to resolve this appeal, I worry about the destination. The court today seems to take us to places the Supreme Court has warned us against and to drive us into the maw of a circuit split.

For starters, my colleagues' new categorical rule is hard to reconcile with the Fourth Amendment's language and the Supreme Court's general approach to it. As we've seen, our constitutionally assigned task is to assess the *reasonableness* of governmental conduct. In performing that job, we are usually told to be sensitive to the totality of the circumstances, to view rigid rules with a degree of skepticism, to ask what reasonably prudent people do and think and not how legal technicians might. Yet a legal technician's rigid rule seems exactly what the court adopts today. Under the court's approach, it doesn't matter that the law is ambiguous and it doesn't matter whether the facts on remand might show that most people in New Mexico read the law as Officer Baker did, that officers were trained to read it that way, or even that many experts agreed with this reading. Under the court's approach, it simply doesn't matter how "arguably . . . reasonable," Maj. Op. at 17, Officer Baker's mistake turns out to be in light

of the totality of the circumstances: the fact that we "legal technicians" later (much later) find his interpretation in error is enough to be sure he violated the Fourth Amendment.

My colleagues' categorical approach is in tension, too, with the Supreme Court's even more specific directions about how we should treat officer errors in Fourth Amendment cases. It is long settled, for example, that "[a] traffic stop based on an officer's *incorrect but reasonable assessment of the facts* does not violate the Fourth Amendment." *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) (emphasis added);` *see also Hill v. California*, 401 U.S. 797, 803-04 (1971). Exactly the same holds true for officer mistakes in interpreting the Constitution's commands: only unreasonable mistakes offend the Fourth Amendment; reasonable mistakes are routinely upheld. *See Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979). Whether we are facing a mistake of fact or constitutional law, then, we've been told to employ the traditional totality of the circumstances approach. It is unclear to me how or why we might single out officer mistakes of substantive law and adopt for them alone a new categorical Fourth Amendment rule alien to the treatment of all other species of officer mistakes. Not to mention when the Supreme Court and we already recognize that mistakes of substantive law can be and are reasonable in so many other contexts (qualified immunity, collateral review, administrative law, to name just a few).

For its part, the court today doesn't dispute that *all* other kinds of officer mistakes are addressed under a totality of the circumstances approach in the Fourth Amendment context. It doesn't dispute the adequacy of that traditional approach to protect Fourth Amendment values when it comes to other kinds of officer mistakes. It doesn't dispute that we have long recognized in other doctrinal areas that mistakes of substantive law sometimes may be reasonable. Instead, it seeks to single out mistakes of substantive law alone and devise a new categorical rule of Fourth Amendment law for them alone.

But what the court today *doesn't* do is tell us *why* its course is necessary. To be sure, the court does tell us that mistakes of constitutional law are different from mistakes of substantive law. Different because officers may assume the legislature will pass only laws that are constitutional, while this same "reliance argument does not apply to mistakes about substantive law." Maj. Op. at 15. The difficulty is, the court never explains how this observation compels its new rule. We might all agree that officers are usually entitled to assume the constitutionality of the substantive laws they are hired to enforce, just as the court says. But it's unclear why this observation necessitates a new categorical rule holding officer mistakes of substantive law always violate the Fourth Amendment — why the usual totality of the circumstances approach isn't appropriate in this single arena. The court just doesn't say.

Perhaps the court's unspoken premise is that constitutional law errors are categorically forgiven so an inverse categorical rule condemning substantive law errors is unremarkable. But if that's the premise, it is a faulty one. The Supreme Court has never said we should categorically forgive officer errors of constitutional law. Surely, after all, *some* constitutional standards are so blindingly clear and *some* statutes so blindingly unconstitutional that an officer enforcing those statutes would be unreasonable because "any person of reasonable prudence would be bound to see [their] flaws." *DeFillippo*, 443 U.S. at 38. An officer's *general* ability to rely on the constitutionality of a legislature's enactments, then, is not exceptionless but merely serves as one consideration or input in the usual totality of the circumstances inquiry.

Turning to officer mistakes of fact, my colleagues say the usual totality of the circumstances approach is appropriate there because officers sometimes must make "probabilistic judgments" about uncertain factual scenarios "based on their experience and common sense," judgments that may well be reasonable even if they later turn out to be wrong. Maj. Op. at 15-16. Meanwhile, my colleagues reason, "this need to make probabilistic judgments . . . does not transfer to the interpretations of laws." *Id.* at 16.

Once again, however, my colleagues don't explain what difference their distinction makes. Even assuming officers *never* need to make probabilistic judgments about substantive laws, the court does not tell us why this warrants its

- 11 -

unusual new rule, why the usual totality of the circumstances approach can't do the job equally well.

Neither, once again and in any event, is the court's premise correct. Officers sometimes *do* have to make probabilistic judgments not just about facts but also about whether the conduct they witness while on patrol falls within the scope of an ambiguous legal code. Judgments that may not be vindicated as correct in retrospect but that may be reasonable at the time. In qualified immunity cases we have long recognized that officers sometimes must and do make probabilistic judgments about ambiguous laws and we hold them civilly liable only when their judgments are foreclosed by clearly established law. In habeas and administrative law, we recognize that state courts and administrative agencies must sometimes make probabilistic judgments about ambiguous laws, and we usually decline to reverse them so long as their judgments are at least reasonable. It is altogether unclear why we would in the Fourth Amendment context alone ignore the reality that probabilistic judgments are and must be made all the time about ambiguous substantive laws, adopting a rule that prohibits us from ever upholding an officer's entirely reasonable probabilistic judgment about even a painfully opaque state statute.

C

While the court fails to offer a persuasive account of the need for its new rule, one might wonder whether some other, unarticulated reason exists sufficient to sustain its conclusion.

One might wonder, for example, whether adopting any more forgiving an approach toward mistakes of law would risk inviting the moral hazard of discouraging officers from familiarizing themselves with the laws they are expected to enforce. Or whether failing to follow my colleagues' new rule might even have the unintended secondary effect of inviting state legislatures to make their legal codes even more voluminous, knowing that by complicating the law they help make exclusion less likely.

These concerns have certainly given me pause in considering this case and no doubt will give pause to anyone concerned with Fourth Amendment values. But the difficulty is we *also* have to worry about any legal regime that fails to encourage officers to investigate the facts thoroughly enough or attend to the Constitution's commands carefully enough. And as we've seen, the Supreme Court has long told us that the traditional totality of the circumstances approach affords sufficient protection against the relevant moral hazards in these situations by permitting us to identify unreasonable officer mistakes of fact or constitutional law, hold them unlawful, and in this manner deter future similar improper conduct. Before abandoning that approach, we need some account why it is

uniquely ill-suited to mistakes of substantive law, why the totality of the circumstances approach is insufficient to address the relevant moral hazards *only* when it comes to mistakes of substantive law. That is a burden, however, neither Mr. Nicholson nor the court has sought to carry.[10]

Some have observed that lay persons can't use "ignorance of the law" as an excuse for their torts or crimes. Given this rule, they submit, law enforcement officers shouldn't be allowed to invoke the excuse to defend their searches and seizures. Simple fairness, the argument goes, requires no less.

I am not immune to the tug of this idea either but unexposed difficulties lurk here too. Most significantly, the notion that "ignorance of the law is no excuse" for defendants accused of crime or sued in tort is "subject to numerous exceptions and qualifications." Wayne R. LaFave, *Substantive Criminal Law* § 5.6(a) (2d ed.). Some commentators have gone so far as to suggest that "[n]o area of the substantive criminal law has traditionally been surrounded by more confusion than that of ignorance or mistake of fact or law." *Id*. So, for example,

---

[10] The court does say "fears that [its] rule is too restrictive" are "overstated" because any section of the traffic code — not just the one an officer cites — can be used to uphold a traffic stop. Maj. Op. at 13. But I am not concerned with whether the court's rule is "too restrictive" as a matter of policy, only with whether that new rule can be justified in light of existing jurisprudence. Besides, the court's argument may prove too much. By parallel reasoning, shouldn't we adopt a categorical rule holding unconstitutional stops resting on an officer's reasonable mistake that facts existed to permit the seizure when, in fact, no such facts existed? Such a rule, one might argue, wouldn't be "too restrictive" because we already allow the government to justify a stop by pointing to facts unknown to the arresting officer but known to other officers.

a defendant's mistake of law *does* form a valid excuse if and when it negates a *mens rea* element necessary to secure liability or a conviction: a man who walks off with another's umbrella on a rainy day thinking theft is not a crime may have no defense at common law, but the man who takes another's umbrella thinking (incorrectly) his right to it has vested very well may have a good defense because theft often requires proof of an intent to deprive the owner the possession of his property. *Id.* Nor is that the end to the confusion. Even the apparently simple task of distinguishing between mistakes of fact and law can often prove vexing, so much so that in past cases we've sometimes had to remand the task to the district court for help. *See, e.g., Tibbetts*, 396 F.3d at 1138-39.

As all this highlights, if we really wanted to take up the task of transmogrifying a *mens rea* defense from tort and crime into a new Fourth Amendment rule — never mind that the Fourth Amendment usually doesn't care about an officer's state of mind — it would prove a much more subtle and onerous task than adopting a simple rule against all officer mistakes of substantive law. In each case we would have to ask not only whether the officer's error really qualifies as one of law rather than fact — a question that would itself often wind up occupying much time and effort — we would *also* have to ask whether the error bears a closer resemblance to the mistake of the man who thinks his right to an umbrella has vested rather than the mistake of the man who thinks theft isn't a crime. At the end of the day, too, we would have to ask whether the

game is worth the candle, whether the complex regime we've created is actually any fairer or more protective of Fourth Amendment values than the traditional totality of the circumstances test.

My colleagues hint at a future where these questions come very much alive. Anticipating what we might call the umbrella problem, they acknowledge that "some mistakes of law — say as to legal ownership — might nonetheless be excused as being closer to a mistake of fact" for Fourth Amendment purposes. Maj. Op. at 17. My colleagues thus adorn their new rule with a notable exception from its birth. And in doing so they invite debate in future cases over which officer errors of law are and are not close enough to factual errors to be treated as mistakes of fact subject to a totality of the circumstances analysis rather than subject to their new (now semi-)categorical rule for mistakes of law. The court's candor about all this is admirable but it also suggests a future in which our attention is deflected from the underlying Fourth Amendment reasonableness question to the collateral and formalistic task of trying to distinguish "pure" mistakes of law from mistakes of law that seem "closer to" mistakes of fact. A future in which our course will be a good deal more convoluted but fail to yield any greater protection for Fourth Amendment values.

Neither is this the only concern we should have about the future. To avoid violating the Fourth Amendment, my colleagues insist that officers have to avoid mistakes even very able judges make when interpreting highly reticulated and

ambiguous statutes. But what about, say, ambiguous case law? Especially when (as happens from time to time despite everyone's best intentions) the relevant case law is demonstrably inconsistent? What about obscure regulatory edicts that may bear on an officer's work? What about an officer charged with local ordinance that turns out to offend state statutes and is therefore invalid? *See, e.g.*, *United States v. Alexander*, No. 07-00256, 2008 WL 2714076, at \*10-11 (M.D. Tenn. July 9, 2008); *Combined Commc'ns Corp. v. City & Cnty. of Denver*, 542 P.2d 79, 82-83 (Colo. 1975). In an age where law is as plentiful as trees in a forest and as tangled as the undergrowth, is it really appropriate to assume — as the court does — that *every* mistake of law is a Fourth Amendment violation?

Perhaps to avoid these complications there will emerge some way to limit the court's holding today to officer errors of statutory law. But doing so would itself only raise further questions about the value and appropriateness of the court's new rule in the first place. Consider the court's effort to distinguish the local ordinance problem I've identified. The court says an officer "likely" would be justified in relying on and enforcing the ordinance "based on the reliance principles set forth in the Supreme Court's cases analyzing mistakes regarding the constitutionality of the law." Maj. Op. at 17. But any resolution of a conflict between a local ordinance and state law is itself a question purely of *state* law (if sometimes state constitutional law), and the Supreme Court's existing cases excusing reasonable mistakes of constitutional law are restricted to mistakes of

*federal* constitutional law. So it seems the court today is prepared to open a *second* exception to its new rule about officer mistakes of law, one for errors concerning conflicts between local and state law. These errors may be treated under the usual totality of the circumstances test while errors in questions of pure statutory interpretation must be held, categorically, to violate the Fourth Amendment. In suggesting as much, the court only speeds us further down the road toward a regime with a "rule" pocketed with exceptions, one that promises to be a good deal more complicated to administer and not obviously any more protective of Fourth Amendment values than simply following the usual totality of the circumstances approach in every case.[11]

D

Whatever else might be said about the merits of its (now twice excepted) rule, the court today says its course is compelled by circuit precedent. But as it happens, the court today goes much further than any of our precedents — and in doing so propels us into the middle of a circuit split.

---

[11] The court suggests that, when in doubt about the meaning of a law, officers "can, in some circumstances, seek a warrant to confirm their belief about the interpretation of a statute." Maj. Op. at 14. But the warrant requirement doesn't apply to traffic stops like the one at issue here, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), because officers aren't reasonably expected to seek warrants from courts (let alone ones that amount to a declaratory judgment on the meaning of an ambiguous statute and may require a good deal of study to decide) while following a suspect's car and contemplating a traffic stop.

The court says *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004), obliges it to hold all officer mistakes of law offend the Fourth Amendment. But that case merely ruled that an officer's "failure to understand the *plain and unambiguous* law he is charged with enforcing . . . is not objectively reasonable." *Id.* at 1144-45 (emphasis added). In that case, too, there was no other evidence bearing on the officer's reasonableness or unreasonableness before the court. Absent any attenuating circumstances, I don't doubt we'd all agree without a moment's pause that an officer's failure to follow "plain and unambiguous" laws is unreasonable. But whether that description fairly applies to our case no one can say at this point. The district court has yet to assess the circumstances surrounding Officer Baker's stop. And the court itself today expressly assumes the statute before us is *ambiguous* and so, by definition, seemingly untouched by *DeGasso*'s holding concerning officer mistakes about the meaning of "plain and ambiguous" statutes. Maj. Op. at 9.

The court also points to a sentence in *Tibbetts* stating that the "failure to understand the law by the very person charged with enforcing it is *not* objectively reasonable." 396 F.3d at 1138 (emphasis in original). This language, the court reasons, requires us to hold that even an officer's mistake about the most perplexingly ambiguous law is never reasonable for Fourth Amendment purposes. The difficulty is, the *Tibbetts* court wasn't even sure whether the mistake at issue before it was one of fact or law and remanded the case to the district court to

- 19 -

make that call, a call that could have easily wound up with a determination the error wasn't one of law in the first place. *Id.* at 1138-39. It isn't clear, then, whether *Tibbetts'*s stray sentence about mistakes of law that my colleagues lean on so heavily was even necessary to the resolution of the case or just dicta. *See NLRB v. Int'l Bhd. of Elec. Workers, Local 340*, 481 U.S. 573, 591 n.15 (1987) (statements "unnecessary to the disposition" are "dict[a]"). The same sort of difficulty attends the court's reliance on *Sherouse v. Ratchner*, 573 F.3d 1055 (10th Cir. 2009), where the court held the mistake before it wasn't one of law at all but one better characterized as one of fact. *Id.* at 1060.

Neither, for that matter, is there any evidence that the court and parties in *Tibbetts* or *Sherouse* grappled with the reasonableness or unreasonableness of officer mistakes about *ambiguous* laws. Certainly neither case mentions the issue or the competing arguments on both sides of that debate — let alone acknowledges the circuit split we shall witness in a moment. And it is well settled that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

While this circuit has never before ventured a holding so bold as my colleagues do today, I readily acknowledge some others have adopted the

categorical, no-mistakes-of-substantive-law rule my colleagues now endorse. *See, e.g.*, *United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006); *United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003); *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998). But many of these decisions seem to rely on the problematic analogy to the common law's dictum that ignorance-of-the-law-is-no-excuse. And many other courts besides have expressly rejected such a categorical approach, preferring instead the traditional totality of the circumstances test. *See, e.g.*, *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005); *Travis v. State*, 959 S.W.2d 32, 34 (Ark. 1998); *Moore v. State*, 986 So. 2d 928, 935 (Miss. 2008); *State v. Heien*, 737 S.E.2d 351, 356 (N.C. 2012); *City of Wilmington v. Conner*, 761 N.E.2d 663, 667 (Ohio Ct. App. 2001); *State v. Wright*, 791 N.W.2d 791, 799 (S.D. 2010).

Given how divided courts are, perhaps neither my colleagues nor I can claim the trump card when it comes to citing precedent and the only thing we can know for certain is that the substantive Fourth Amendment question dividing us will remain unsettled until our superiors speak.

III

A

Even when a Fourth Amendment violation exists, exclusion of evidence does not automatically follow. Other remedies (from administrative to civil) exist

to punish and deter officer misconduct. To be sure, exclusion is an especially potent remedy, but it is one courts may choose to apply or not apply as a "prudential" matter, not one individuals may insist on as a matter of "personal constitutional right." *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks omitted); *see also Herring v. United States*, 555 U.S. 135, 141 (2009).

Whether suppression is the right remedy in any particular case requires, the Supreme Court has said, an assessment of the competing social costs and benefits associated with exclusion. *See Davis*, 131 S. Ct. at 2427 ("Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one. The analysis must also account for the substantial social costs generated by" exclusion (citations and internal quotation marks omitted)); *Herring*, 555 U.S. at 141.

Trying to administer this cost-benefit task is difficult under the best of circumstances. In deciding whether to impose exclusion, courts must "weigh" or "compare" incommensurate goods (the deterrence benefits associated with suppression) and costs (the losses to society as a result of allowing criminal conduct to go unpunished) — a challenge akin to "comparing constitutional apples with constitutional oranges." Orin S. Kerr, *Good Faith, New Law, and the Scope of the Exclusionary Rule*, 99 Geo. L.J. 1077, 1108 (2011); *see also* Joseph Raz, *The Morality of Freedom* ch.13 (1986). A challenge made all the more complex by the grand societal scale on which the measurement is supposed to take place.

Trying to administer the cost-benefit analysis without the benefit of the district court's factual findings on the relevant questions makes a tough task tougher still. At this point, for example, we don't have any factual findings about how deterrable Officer Baker's mistake might have been — findings that might allow us to judge how beneficent exclusion might prove to be. We don't know if the officer stopped Mr. Nicholson because he lazily assumed the law must preclude the maneuver, because he diligently studied what was (incorrectly) taught at the police academy, or because he took his own best shot at reading the left-turn statute. Because we don't know the relevant facts, we can't meaningfully assess the risk that failing to exclude here would encourage other officer mistakes of law — the likelihood that failing to exclude, in other words, would invite moral hazard. Neither do we have a full picture of the social costs that might or might not be associated with exclusion in this case. As I have already explained, I would remand the substantive Fourth Amendment question. Given that, it seems to me there is no reason to try to tackle the remedial question and its attendant factual questions for the first time in an appellate vacuum. After considering on remand whether Officer Baker's conduct was constitutionally unreasonable, I would simply ask the district court to proceed to the question whether, assuming a constitutional violation, exclusion is the appropriate remedy.

Appearing to recognize the challenges associated with its cost-benefit approach, the Supreme Court has recently offered an alternative and seemingly

more tractable test. It has instructed that the "basic insight" guiding the remedial inquiry is that "the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 131 S. Ct. at 2427 (alteration omitted) (citations omitted) (internal quotation marks omitted). The deterrent benefits associated with exclusion outweigh the costs, too, when law enforcement exhibits "recurring or systemic negligence." *Id.* at 2428. But when officers behave only non-negligently "or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force." *Id.* at 2427-28 (citations omitted) (internal quotation marks omitted). In these cases, exclusion's "costly toll upon truth-seeking and law enforcement objectives" prove insufficient to "pay its way." *Herring*, 555 U.S. at 141, 147-48.

This new culpability framework sounds familiar, even comforting, to judicial ears: courts are often called on to assess questions of culpability and they arguably bear more comparative advantages for that task than for performing society-wide cost-benefit analyses. Even so, it still seems to me the best place to begin the work of applying this framework lies in the district court — not this one. So I would ask the district court on remand to consider not just cost-benefit questions but culpability questions too. At this stage, this court simply doesn't have enough facts to venture a guess what answers the culpability test might yield

in this particular case.  Based on what we do know, it seems evident Officer Baker's conduct didn't evince any deliberate or reckless indifference to Mr. Nicholson's rights.  Less clear, though, is whether the officer's conduct was grossly negligent, simply negligent, or not negligent at all.  Evidence would help sort this out.

Now, I admit some unanswered legal questions also exist about the culpability framework and a district court trying to handle this case on remand would reasonably expect our guidance on them in advance.  What, for example, does the Supreme Court have in mind when it speaks of "simple, isolated" negligence?  The phrase might mean "simple" (or ordinary) negligence that doesn't occur very often (and so in this sense is "isolated").  Alternatively, the phrase might mean ordinary negligence committed by a *third party* who is in that sense "isolated" from the arresting officer.  It seems to me the first alternative is by far the more likely.  The first interpretation comports with the use of the term "isolated" in *Herring*, where the Court separately used the term "attenuation" — not "isolated" — to refer to a third party actor who committed the error.  *See* 555 U.S. at 150 (referring to "an isolated, negligent recordkeeping error attenuated from the arrest").  And the second alternative leaves us with an underdeterminative scheme, one lacking any guidance on how to treat ordinary negligence by arresting officers — a most unlikely outcome.

- 25 -

The line between "simple" and "gross" raises questions too. When it comes to defining degrees of negligence, adjectival epithets like "gross," "wanton," and "wicked" have long proven frustratingly protean. *See, e.g.*, *Steamboat New World v. King*, 57 U.S. 469, 474 (1853); *Daniels v. Williams*, 474 U.S. 327, 334 (1986); *Wilson v. Brett*, (1843) 152 Eng. Rep. 737 (Exch. of Pleas) 739; 11 M. & W. 113, 115-16. Suggestively, though, *Davis* and *Herring* refer to recklessness and gross negligence as separate categories and presumably this much indicates the Court intends a difference. We know that recklessness usually requires proof of a conscious indifference to the consequences of one's conduct. *See* Model Penal Code § 2.02; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 211-12 (5th ed. 1984). So it seems we could safely advise the district court that gross negligence in this context requires a degree of officer culpability more than standard unreasonable conduct (negligence) but less than a conscious indifference to the consequences of his conduct (recklessness).[12]

---

[12] Determining what separates "isolated" from "recurring" negligence presents difficulties as well. Should we look at the particular police department, the county, the state, or entire country? And what should we do about mistakes that appear more reasonable the more they occur? *See, e.g.*, *Chanthasouxat*, 342 F.3d at 1279 (officer mistake of law "reasonable" when officer had "history of having written more than 100 tickets" in similar circumstances). And might the possibility that a failure to exclude would invite recurring negligence — the moral hazard problem and a possibility in this case — suffice for a finding of recurring negligence? On all this, we have no guidance from the Supreme Court yet and I confess I am without any advice to offer the district court. Some questions, and these may be among them, just have to be sorted out in cases as they come.

B

My colleagues bypass the hard remedial questions, factual and legal. After finding a Fourth Amendment violation, they proceed immediately to order exclusion of evidence and instruct the district court to vacate Mr. Nicholson's drug and firearm convictions. They say we can and should disregard the various remedial inquiries the Supreme Court has dictated because the government didn't argue the question of remedy in the district court and thus forfeited it on appeal. *See* Maj. Op. at 20.

I do not believe this is a course open to us. It is long settled that an appellee is entitled to "defend the judgment [it] won below on any ground supported by the record." *Robinson v. Robinson (In re Robinson)*, 921 F.2d 252, 253 (10th Cir. 1990); *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 745 n. 2 (10th Cir. 2005); *Tinkler v. United States ex rel. FAA*, 982 F.2d 1456, 1461 n. 4 (10th Cir.1992). It is settled, too, that "in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (quotation marks omitted); *Helvering v. Gowran*, 302 U.S. 238, 245 (1937) (collecting authority). While the government didn't present a remedial argument in the district court, it prevailed on the substantive Fourth Amendment question and so had little need to proceed to the question of remedy. Now defending its victory on appeal, the government has

- 27 -

expressly argued — as it is entitled to do — that the district court should be affirmed *either* because no substantive Fourth Amendment violation occurred as the district court reasoned *or* because, even if a violation did occur, suppression is an inappropriate remedy.  Mr. Nicholson has responded to both lines of defense.  The remedial issue is thus properly presented and developed as an alternative ground for affirmance.  I do not see how we might simply *ignore* the argument.

To this, the court replies by offering a second, separate rationale for declining to consider the remedial question.  It contends that even if we took up the question the record as currently constituted is insufficient to permit us to affirm.  Maj. Op. at 20.  This course at least has the virtue of confronting the appellee's alternative argument for affirmance, as we are obliged to do.  But if, as I have suggested, a remand is already required on the substantive Fourth Amendment question, it follows that we should also permit the district court to develop a record and assess the remedial question on remand as well.  Especially when the Supreme Court has instructed us — repeatedly — that exclusion isn't automatic but should be closer to a "last resort'" than a "first impulse." *Hudson*, 547 U.S. at 591; *see also Davis*, 131 S. Ct. at 2426; *Herring*, 555 U.S. at 141.  In similar circumstances other circuits have routinely followed exactly the path I suggest. *See, e.g.*, *United States v. Fugate*, 499 F. App'x 514, 520 (6th Cir. 2012) (unpublished); *United States v. Wright*, 493 F. App'x 265, 273 (3d Cir. 2012)

(unpublished); *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010); *United States v. Julius*, 610 F.3d 60, 67-68 (2d Cir. 2010).

\* \* \*

With a healthy dose of hindsight we know Officer Baker, like the district court, made a mistake. In my view, it's enough work for the day to correct the mistake and remand the case for a thorough reassessment in that new light. My colleagues prefer a more arduous journey — to a new categorical rule, then to exceptions to that categorical rule, and finally to a refusal to entertain the government's remedial argument. I do not doubt their journey is grounded in a wish to give voice to the Fourth Amendment. But at the end of the day I am unable to join them because the trip seems to me both unnecessary to resolve this appeal, uncertain to yield any benefit for Fourth Amendment values, and destined to take us places inconsistent with the Supreme Court's instructions and into circuit splits besides. I respectfully dissent.